[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This matter involves numerous post judgment motions for modification of judgment and findings of contempt which were filed by each of the parties.[1]
The modification motions deal with parental access and child support. In her motions, the plaintiff seeks to lessen the father's midweek contacts with the child and increase the amount of the child support payments which she receives from the defendant. Conversely, the defendant asks that the amount of his child support be reduced and that his access with the child be increased to add an additional overnight visit each week.
FACTUAL FINDINGS
The court has carefully considered all of the evidence which was introduced during the contested hearing and finds that the facts set forth below were proven by a preponderance of the evidence.
The plaintiff and the defendant were married on August 19, 1989. Their son, Alexander (Alex) was born on October 3, 1994.
The parties' marriage was dissolved by the court (Gruendel, J.) on December 1, 1998. At that time, the court awarded the parties joint legal custody of the minor child. However, the court deferred decisions on the issues of designating a primary parent and parental access until a contested hearing, which was scheduled on January 4, 1999.
On January 4, 1999, the court (Moore, J.) ruled that Alexander's primary residence was to be with the plaintiff mother. Judge Moore also ordered that the father would have the following parental access schedule:
1. The father would have the child with him on alternate weekends from Friday evening until Monday morning.
2. During the week preceding the mother's weekend, the father would have the child with him Wednesday overnight, and on Thursday until after dinner.
3. During the week preceding the father's weekend with the child, the father would have the child with him overnight on Monday and until Tuesday after dinner.
Despite the fact that the parties have now been divorced for nearly three and one-half years, they continue to engage in extensive CT Page 6018 post-judgment conflict. The plaintiff and the defendant, who reside in adjoining towns, have poor communication, and engage in frequent disagreements concerning Alex.
The focal point of the parties' dispute in this litigation is the father's Tuesday and Thursday evening dinner visits with the child. The defendant requests that the court extend these contacts to overnight visits. He proposes that instead of returning Alex to his mother's home after dinner, the child should remain with him overnight, and be driven directly to school the following morning. The mother objects to this. She claims that the father has been inconsistent in returning the child on time to her home on school nights and has failed to sufficiently monitor the child's homework.
There was credible evidence at hearing that the child has, on occasion, become upset when it is time to leave his father's home after the midweek dinner visits. Alex is sometimes tearful, and frequently expresses the desire to stay longer at the defendant' s home.
However, there was also evidence which the court found to be credible that the child does not seem to exhibit sadness or distress when he is returned to the plaintiff's home after the dinner visits by his stepmother. (Plaintiff's Exhibit 3, p. 8)
A psychologist appointed by the court to review this matter opined that Alex senses his father's distress and sadness at the end of visits, and this may exacerbate the child's reaction.
"Alexander is quite clear that he loves both parents and misses both of them when away from them, a reaction not uncommon in children of divorce. He also appears precociously astute in his assertion that the transitions can be inconvenient for him and that they remind him of the divorce, leading him to feel upset. Alexander is an astute and sensitive youngster who is accustomed to having his needs met, and has difficultly with tolerating disappointment or emotion, a difficulty which is not developmentally unusual. His parents, however, have a great deal of difficulty themselves tolerating his disappointments or difficulties and are vulnerable to overreacting and over involving themselves in his distress." (Plaintiff's Exhibit 3, pp. 7 and 8). The psychological evaluator also found that the defendant father " . . . over interprets Alexander's distress regarding the transitional issues, perceiving [the child's] feelings, not unnaturally, through the filter of his own distress." (Plaintiff's Exhibit 3, p. 7)
The court found the foregoing observations and opinions of the psychological evaluator to be credible, and accepts them as fact. CT Page 6019
The plaintiff complained that the defendant has failed to adequately monitor Alex's homework during the midweek visits and has, on occasion, returned the child later than agreed on a school night. However, the evidence at hearing did not establish that the mid-week visits negatively affected the child's academic performance.
Evidence at hearing established that Alex equally loves both of his parents. He fantasizes about them reconciling. He wants their conflict to end, and desperately wishes to avoid hurting or offending either parent.
In a report dated April 24, 2001, the court-appointed psychologist aptly summarized the relationship which exists between the plaintiff and the defendant: "Both parties hold on to a wish to have the other party change, and that position keeps them from appreciating and supporting the parenting of the other." (Plaintiff's Exhibit 3, p. 8).
Unfortunately, Alex is acutely aware of his parents' acrimonious relationship, and has been adversely affected by it. As noted in the court's psychological evaluation: " . . . the extent to which Alex continues aware of parental conflict and is confused and unaccepting of the divorce is reflective of the continuity of parental conflict and the failure of the parents to shield their son from it. Alexander clearly identifies himself as the source of the parental conflict, believing that his parents got along until he came along and they began to compete over ownership of him, a belief which is also a precocious appreciation of the competitive aspects of his parents' functioning." (Plaintiff's Exhibit 3, p. 8).
The psychologist also noted in her written report that "Alexander appreciates that his parents love him, but he cannot reconcile himself to their divorce until they close hostilities and demonstrate their own ability to move on with their lives as parents and as individuals." (Plaintiff's Exhibit 3, p. 7).
Here, too, the court found the psychological evaluator's observations and opinions to be accurate and accepts them as fact.
Evidence at hearing proved that both parents have a nurturing relationship with Alex, and are extremely positive role models for their son. However, on occasion, each party has acted in a manner inconsistent with Alex's best interests. Credible evidence established that the plaintiff has made negative comments about the father, and indicated to the child that his father's new wife is not "a friend" of hers. Additionally, the mother has previously refused to engage in post-judgment counseling with her ex-husband, despite the defendant's CT Page 6020 willingness to do so.
The court finds that the father exercised poor judgment in videotaping Alex for purposes related to this litigation. The court finds that the two incidents of videotaping were inappropriate because they invaded the child's privacy, and unnecessarily exposed him to emotionally painful experiences in order to obtain documentary evidence for the hearing.
The professionals involved with this matter disagree about the visitation issue.
The court-appointed psychologist opined near the conclusion of this hearing that the father's midweek visitation should be reduced or eliminated in order to cut down on the number of problematic transitions when the child is returned.
She suggested that the defendant could be given other blocks of time with the child in order to compensate for the lost midweek contacts.
Conversely, the child psychiatrist retained by the defendant believes that the midweek dinner contact should be extended to an additional overnight visit with the father. The psychiatrist based his conclusion upon the fact that the child has expressed the desire to spend more time with his father, and has a close bond with him. The psychiatrist opined that the additional contact would benefit Alex because the defendant is a positive male role model for the child. He also believes that the additional time would eliminate some of the sadness which Alex experiences at the end of visits with his father.
A court-appointed guardian ad litem concurs with the recommendations made by the defendant's psychiatric expert.
The court will make findings with respect to the conflicting opinions of these experts below.
Credible evidence at hearing established that last year the parties mutually agreed that the father's Tuesday and Thursday contacts would be extended to overnight visits during the summer vacation from school. These arrangements were made informally, and no modification order was issued by the court. The contacts went well until the summer ended. Shortly after the current school year began, the defendant refused to revert to the court-ordered dinner visitation schedule and retained the child overnight on one occasion, despite the plaintiff's protests. This incident prompted one of the contempt motions filed by the plaintiff. At hearing, the court-appointed psychologist opined that the second midweek overnight visit works better during summer vacation than it does during CT Page 6021 the academic year, because the child has no school or homework during the summer, and schedules are more relaxed. The court found that opinion to be credible.
The defendant currently pays court-ordered child support to the plaintiff in the amount of $325.00 per week.
The defendant earned gross income of $197,000.00 in 1997. His gross income was $386,204.00 in 1999 (plaintiff's Exhibit 1) and $335,153.00 in 2000 (plaintiff's Exhibit 2)
The defendant testified credibly that he recently changed positions with his employer, a major insurance company. The defendant, who holds a Masters of Business Administration degree, was previously in a sales position at the company. He earned a base salary of $80,000.00 per year, but that position offered the possibility for earning extensive commissions. In his new management job, the defendant is paid a gross annual salary of $150,000.00. There is also the possibility that he can earn a management bonus. The defendant received a bonus of $23,000.00 for the year 2001 in March 2002.
At the time of the dissolution, the plaintiff earned gross salary of $1,460.00 per week. Her most recent financial affidavit indicates a gross salary of $1,455.00 per week, or $75,660.00 per year. The plaintiff also received an individual performance award of $3,000.00 from her employer in March 2002.
Based on the evidence provided, the court finds that the plaintiff presently earns approximately $78,000.00 per year and the defendant now earns approximately $173,000.00 per year.
It was represented to this court during hearing that the child support order of $325.00 per week was based on the defendant earning gross income of $200,000.00 per year.
The court will not recite herein the evidence presented by the parties concerning their respective contempt motions. The court finds that neither party proved by clear and convincing evidence that the allegations set forth in their motions constituted wilful and contemptuous defiance of the court's orders.
FINDINGS AND ORDERS
The defendant's psychiatric expert has recommended the defendant's midweek dinner contacts with the child be extended into a second overnight visit each week. The court-appointed psychologist believes that CT Page 6022 midweek visitation should be eliminated due to the history of problematic transitions at the end of these contacts.
The court, while respecting the sincerity and professionalism of each expert witness, does not totally concur with the recommendation of either mental health professional.
The court finds that when they are viewed in their totality, the orders established in January 1999 by Judge Moore provide each party with extensive access to Alex. The parents live in relatively close proximity to each other. They both love Alex, and have a close, nurturing relationship with him. That affection is clearly reciprocated by the child. The mother and father are both extremely positive role models for their son. Each parent is financially secure, and can certainly provide for all the child's physical needs. Accordingly, all of the essential components for a successful joint custody arrangement are in place.
Unfortunately, however, the parties have continued to bicker over their child, instead of supporting and respecting each other as parents. The child is caught squarely in the middle of this control struggle. He blames himself for the unhappiness which each of his parents is experiencing, and is being emotionally harmed as a result.
Alex's most fervent wish is that his mother and father would end their hostility toward each other.
The court is not persuaded that the proposals advocated by either party, or the two psychological experts, will lessen the current level of parental conflict, or measurably improve Alex's situation.
The court finds that Alex's distress at transitions is, to a considerable degree, prompted and magnified by the unhappiness and distress which the child perceives the father to be experiencing. The court notes the credible evidence that the child does not seem to display such angst or discomfort when he is returned at the end of visits to his mother's home by a person other than the defendant.
However, the court also finds that it would be detrimental to the child's best interests to reduce the midweek contacts, as Alex deeply wishes to be with both parents and needs regular contact with them both. It is likely that some of the transitional problems could be abated or alleviated if the father made arrangements for the child's stepmother, or some other person, to return him to the mother's residence at the end of visits. It would also help if the father took steps to mask his own feelings of distress, and to direct the child in a positive fashion when the child exhibits sorrow at the time of transition. CT Page 6023
The court finds that the primary problem in this case is not the frequency or configuration of visitation, but rather the level of conflict that exists between the parents. it is also very unfortunate that, until recently, the plaintiff has been resistant to post-dissolution counseling.
The court finds that until the parties make concerted efforts to improve their communication and work harmoniously with each other, alterations to the access schedule will accomplish very little, and could even exacerbate the parental discord.
The court has considered all of the evidence in this case, as well as the provisions of C.G.S. § 46b-56 (b). Based on the foregoing, the court issues the following orders with respect to each party's motion to modify parental access:
A. All of the existing orders issued by Judge Moore shall remain in full force and affect, except that during the child's summer vacation and during week-long vacations from school during the academic year, the child's weekly "dinner visit" with the father shall be an overnight visit. At all other times during the year, the second mid-week visit shall remain a "dinner visit" only. The court orders that the parties are to abide by all prior orders, including orders pertaining to the pick-up and delivery of the child. In the event that any disagreement or perceived ambiguity exists concerning the pick up and delivery of the child, the parties shall first confer in an attempt to reach an agreement. In the event of continued disagreement, the matter shall be brought by motion to this court for additional orders. The court orders that, wherever possible, a person other than the defendant is to return Alex to his mother's home at the end of the week night dinner visit.
B. The court orders that the parties are to immediately enroll in, and successfully complete, the "Peace Program" offered through the court's Family Relations Office. The Family Relations Office is requested to meet with the parties and facilitate their enrollment in said program. Absent exigent circumstances, this court recommends that court hearings on any future motions pertaining to Alex's custody and visitation be deferred until the parties have completed the "Peace Program." It is the hope and intention of this court that participation in the "Peace Program" will reduce the existing level of conflict between the parties, increase their communication, and enhance their ability to harmoniously parent Alex.
C. Neither party shall disparage the other in the presence of the minor child, nor discuss matters pertaining to this case with the minor child. CT Page 6024
D. Neither party is to make, nor cause to be made, audio or videotape recordings of the minor child for any purpose related to litigation in this case, without prior order of this court.
With respect to each party's motion for modification of child support, the court makes the following findings and orders:
The existing child support order of $325.00 per week was based on the defendant earning gross income of $200,000.00, regardless of any sums above that amount which he might have earned through commissions. The plaintiff's current income is approximately the same as it was at the time of dissolution. The defendant's current income is approximately $173,000.00. Pursuant to C.G.S. § 46b-86, the court finds that this decrease in the defendant's income constitutes a substantial change in his financial circumstances. Given the amount of combined parental income, state child support guidelines do not apply.
The court orders that the judgment be reopened and modified, and that the defendant pay to the plaintiff as child support the sum of $285.00 per week. Said child support payment shall be made by immediate wage execution. The defendant's counsel shall prepare, and submit to this court for signature, an amended wage execution order form conforming with these orders.
Since the court did not have the benefit of reviewing either party's W-2 forms for the year 2001, the court makes no order with respect to retroactivity of this modification. The court orders that the parties shall exchange, their Federal Income Tax returns and W-2 forms on April 15th of each year.
The court has previously found that neither party proved by clear and convincing evidence the allegations set forth in their respective motions for findings of contempt. Each of the contempt motions is hereby DENIED.
SO ORDERED.
BY THE COURT
_____________ Dyer, J.